THE STATE OF OHIO, APPELLEE, *v.* STOUT, APPELLANT.

(No. CA87-03-040—Decided December 14, 1987.)

*John F. Holcomb,* prosecuting attorney, and *Robert N. Piper III,* for appellee.

*T. Randall Turner,* for appellant.

*Per Curiam.* This cause came on to be heard upon an appeal from the Court of Common Pleas of Butler County, Ohio.

During the early morning hours of May 3, 1985, Kimberly Stacy was killed when repeatedly stabbed at the Malvern Street residence of defendant-appellant, Mary Sue Stout, in Middletown, Ohio. Later that day, appellant went to the Middletown Police Department where she told the desk officer that she had killed Stacy. After being advised of and waiving her *Miranda* rights, appellant gave a tape-recorded statement to police in which she admitted choking and stabbing Stacy and then dropping her body from a bridge into a river below. That same day, police discovered Stacy's body wrapped in sheets and blankets in Brown's Run Creek beneath the Trenton-Franklin Road bridge.

Appellant was subsequently indicted for murder, for "purposely causing the death of Kimberly Stacy" in violation of R.C. 2903.02(A). Trial by jury commenced on September 24, 1985, but ended in a mistrial. A second jury trial began on February 25 and concluded on February 27, 1987. Prior to the second trial, appellant moved to suppress statements she had made during a telephone conversation with Ruth Ritter, a volunteer with the Middletown Probation Department's Women's Substance Abuse Program. The trial court denied appellant's motion on January 21, 1987.

Appellant testified on her own behalf. She described Stacy as a friend, but acknowledged that their friendship had developed into a lesbian relationship. On May 2, the two attended a 1:00 p.m. meeting of the Women's Substance Abuse Program, then spent the remainder of the day drinking heavily at several Middletown taverns. In addition to consuming alcohol, appellant also admitted taking drugs that day. Appellant remembered sitting on the porch of her home smoking marijuana but could not recall when or how she returned home. The next thing ap-

pellant remembered was awakening on the couch in her house with Stacy lying next to her. Appellant suddenly realized that Stacy was dead and discovered a butcher knife on the floor between the couch and a coffee table. Appellant telephoned Ritter and told her that she had first choked Stacy and then stabbed her. After speaking with Ritter, appellant borrowed her mother's automobile and transported Stacy's body to the bridge where she dropped it into the creek below. Although appellant admitted to several people that she killed Stacy, she denied any responsibility at trial, claiming that because she had no independent recollection of the stabbing she simply assumed that she had done it.

The jury found appellant guilty as charged. She received a sentence of fifteen years to life in the Marysville Women's Reformatory. Appellant filed a timely appeal and for her first assignment of error asserts the following:

"The trial court erred in overruling the defense's motion to suppress the statements made by the defendant to a law enforcement officer and an agent of the state of Ohio."

The main issue for review in this assignment of error is whether Ruth Ritter was a law enforcement officer, thereby requiring her to inform appellant of her *Miranda* rights prior to their telephone conversation on May 3, 1985. In *Miranda* v. *Arizona* (1966), 384 U.S. 436, the United States Supreme Court prohibited the use of inculpatory statements arising from a custodial interrogation of the accused unless the government used certain safeguards to secure the accused's privilege against self-incrimination. A custodial interrogation consists of questioning initiated by *law enforcement officers* after the accused is taken into custody or otherwise deprived of his freedom in any significant way. *Id.* at 444. We must therefore focus on the meaning of the term "law enforcement officer" as it is used in the *Miranda* decision and determine whether Ritter is such a law enforcement officer.

At the hearing on appellant's motion to suppress, Ritter testified that she was a student doing volunteer work in the Women's Substance Abuse Program. Ritter first met appellant in February 1985, when appellant began participating in the program. According to Ritter, the program's purpose was to assist women in recovering from alcohol and substance abuse and to help them improve their lives. The program was operated through the Middletown Probation Department and its participants were usually women who were either on probation or incarcerated in the Middletown jail. Meetings were held twice a week and supervised by Ritter. Ritter would organize the meetings, select movies or group discussion topics, and — although she was reluctant to refer to it as "counseling" — would meet individually with participants if they needed "someone to talk to." Although Ritter kept a record of attendance, most of the women participated in the program because they "needed to," not because their attendance was required. Ritter was under no duty to report to anyone in the police or probation departments as to what occurred at the meetings. If anyone arrived at a meeting under the influence of alcohol or drugs, Ritter usually took no action other than to admonish the offender. Under her own guidelines, however, Ritter would report a second transgression of this nature to the authorities in order to prevent such continued conduct from disrupting the entire group.

Ohio courts have repeatedly addressed the question of who is a law enforcement officer for purposes of requiring *Miranda* warnings prior to questioning. In *State* v. *Ferrette* (1985),

18 Ohio St. 3d 106, 18 OBR 139, 480 N.E. 2d 399, the Supreme Court held that security personnel of the State Lottery Commission had no statutory duty to enforce the laws of Ohio nor were they vested by statute with the power to arrest. Accordingly, they were not law enforcement officers and were not required to give *Miranda* warnings at any time before or during their questioning of a suspect with respect to forged lottery tickets. See, also, *State* v. *Bolan* (1971), 27 Ohio St. 2d 15, 56 O.O. 2d 8, 271 N.E. 2d 839; *State* v. *Giallombardo* (1986), 29 Ohio App. 3d 279, 29 OBR 343, 504 N.E. 2d 1202 (privately employed security guards of retail merchants who have limited power of detention are not required to give *Miranda* warnings prior to questioning a suspect stopped for shoplifting); and *State* v. *Watson* (1971), 28 Ohio St. 2d 15, 57 O.O. 2d 95, 275 N.E. 2d 153 (statement made to newspaper reporter was not the result of questioning by law enforcement officials for purposes of *Miranda*). Cf. *State* v. *Gallagher* (1974), 38 Ohio St. 2d 291, 67 O.O. 2d 354, 313 N.E. 2d 396, vacated on other grounds (1976), 425 U.S. 257, reinstated (1976), 46 Ohio St. 2d 225, 75 O.O. 2d 280, 348 N.E. 2d 336 (statements made to parole officer without *Miranda* warnings are subject to suppression since a parolee is under heavy pressure to cooperate with his parole officer who has the power to recommend the return to prison of a parolee under his charge).

Having reviewed the record, we find that Ritter was not a law enforcement officer as contemplated in *Miranda*. Ritter had neither the authority to enforce the laws of Ohio nor the power to arrest. Her position as coordinator of the Women's Substance Abuse Program does not make her an "agent" of the Middletown Police Department or the Middletown Probation Department. As a volunteer, Ritter only coordinated the meetings, selected the program topics and materials, and talked with the individual participants. Ritter was not authorized to administer substance abuse tests to program participants and was not required to report the daily activities of her group to the probation or police departments. Ritter's only purpose in reporting incidents of intoxication at the meetings was to preserve the group's equanimity and to prevent any unnecessary disruption or disturbance. Considering the totality of the circumstances, we cannot say that Ritter was a law enforcement officer required to give *Miranda* warnings to appellant prior to their telephone conversation of May 3, 1985.

In addition, the recitation of *Miranda* rights would not be required even if we were to concede Ritter's position as a law enforcement official. *Miranda* safeguards are to be afforded to those in custody and not to those who voluntarily make statements regardless of custody. *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 256, 15 OBR 379, 393, 473 N.E. 2d 768, 785, certiorari denied (1985), 472 U.S. 1012. As mentioned above, custodial interrogation is that questioning initiated after a person has been taken into custody or otherwise deprived of his freedom in any significant way. *Miranda* v. *Arizona, supra; Berkemer* v. *McCarty* (1984), 468 U.S. 420. An accused is in custody for purposes of *Miranda* where there has been a formal arrest or restraint of movement of the degree associated with a formal arrest. *Minnesota* v. *Murphy* (1984), 465 U.S. 420; *State* v. *Buchholz* (1984), 11 Ohio St. 3d 24, 11 OBR 56, 462 N.E. 2d 1222.

Ritter testified that appellant telephoned her at home at 3:00 a.m. on May 3, 1985. Appellant repeatedly implored Ritter not to hang up, telling her that she was in trouble. When Rit-

ter asked appellant what she had done, appellant answered that she had killed someone. Appellant then proceeded to identify the victim and described how she had killed Stacy and dropped her body into a river. When Ritter told appellant that she (appellant) would have to call the police, appellant demurred. Ritter told appellant that she would have no choice but to inform the police herself, which she did shortly after her conversation with appellant.

There was no "custodial interrogation" within the meaning of *Miranda* in the case at bar. Appellant initiated the conversation by telephoning Ritter and telling her what she had done. Appellant was not under arrest or otherwise deprived of her freedom at the time of the conversation. Appellant was under no compulsion to speak to Ritter and could have terminated the conversation at any time by simply hanging up the phone. The telephone conversation between appellant and Ritter was not a custodial interrogation requiring the giving of *Miranda* warnings. See *State* v. *Tutt* (Apr. 14, 1986), Warren App. No. CA85-09-056, unreported.

For these reasons, the first assignment of error is not well-taken and is hereby overruled.

For her second assignment of error, appellant claims that:

"The trial court erred in overruling the defense's motion for mistrial upon the witness being asked an improper question and subsequently answering the question after an objection to the question had been sustained."

During the trial, Middletown Police Detective Robert Walton testified with regard to certain photographs he had taken while investigating appellant's residence. During Walton's testimony, the following exchange occurred:

"*Q.* Okay, and I'm going to show you what's been #9B [*sic*] and ask you to explain why you took that, the significance of that photograph?

"*A.* This is a photograph that I took of the couch a [*sic*], the coffee table and also her red tennis shoes that were sitting in front of the couch. This photograph also shows some stains in the carpeting, in front of the couch and ah,. . .

"*Q.* What's the importance of the shoes, if any?

"*A.* The shoes also had what I believed to be blood stains on them.

"*Q.* Okay, I'm going to show you #9C and ask you to explain what that is?

"*A.* This is a photograph, closeup photograph of the coffee table which is located in front of the couch and as you can see in this photograph, it appears to be. . .

"MR. SCHIAVONE: Objection, your Honor, as to the characterization.

"BY THE COURT: Sustained.

"*Q.* Why did you take the photograph?

"*A.* This photograph was taken because I believed this to be bloodstains.

"MR. SCHIAVONE: Objection, move that it be stricken.''

Appellant approached the bench and moved for a mistrial. The court denied the motion but warned the state about further testimony from Walton regarding the nature of the stains.[1] Appellant claims that due to the nature of the trial, Walton's opinion that the photographed stains were blood constitutes prejudicial error.

"The granting or denying of a mistrial * * * rests within the sound discretion of the trial court." *State* v. *Sage* (1987), 31 Ohio St. 3d 173, 182, 31 OBR 375, 382, 510 N.E. 2d 343,

---

[1] A forensic expert for the state later identified the stains as human blood of the same type as that of the victim.

349-350. See, also, *State* v. *Abboud* (1983), 13 Ohio App. 3d 62, 13 OBR 66, 468 N.E. 2d 155. In addition, the trial court is empowered with broad discretion regarding the admission or exclusion of evidence and an appellate court will not disturb the exercise of that discretion absent a demonstration that the accused has suffered material prejudice. *State* v. *Sage, supra; State* v. *McCoy* (Oct. 12, 1987), Butler App. No. CA87-02-012, unreported.

Evid. R. 701 provides that a lay witness may provide opinion testimony where the witness's opinion is rationally based upon the perception of the witness and helpful to a clear understanding of his testimony or the determination of a fact in issue. In *State* v. *Moore* (Oct. 27, 1986), Butler App. No. CA85-04-035, unreported, we permitted a police officer to give his opinion regarding the nature of a stain on a mattress found at the scene of a homicide. The officer gave the opinion that the stain was blood and we held that such an opinion was relevant to a determination of the victim's location either when the wound was inflicted or at the time of death. On the basis of Evid. R. 701, we held that the officer's opinion that the stain "looked like or appeared to be" blood was admissible even though the mattress fabric was discarded prior to any testing.

In the case at bar, Walton's opinion was based upon his perception of the homicide scene in the Stout residence. His opinion was also helpful in gaining a clear understanding of why he photographed the interior of the house in the manner in which he did. The opinion was relevant in that it helped to determine the victim's location when she was fatally stabbed or when she died. For the same reasons expressed in our decision in *State* v. *Moore, supra,* we find no prejudicial error in the case *sub judice* that would require a reversal on the trial court's failure to grant a mistrial. There was no abuse of discretion. The second assignment of error is therefore overruled.

The assignments of error properly before this court having been ruled upon as heretofore set forth, it is the order of this court that the judgment or final order herein appealed from be, and the same hereby is, affirmed.

*Judgment affirmed.*

JONES, P.J., HENDRICKSON and YOUNG, JJ., concur.