OPINION
Defendant-appellant, William A. Goodson, appeals from his convictions in the Preble County Court of Common Pleas for retaliation in violation of R.C. 2921.05(B) and abduction in violation of R.C. 2905.02(A)(2). We affirm.
Appellant and the victim, Debra Barger, met at a New Year's Eve party on December 31, 1997. The couple began dating and appellant spent several nights at Barger's apartment during the month of January. On January 23, 1998, Barger filed a complaint against appellant for unauthorized use of a motor vehicle, alleging that appellant had driven her car without her permission.
Appellant urged Barger to withdraw the complaint against him during the following weeks. On February 28, 1998, appellant visited Barger at her apartment. What happened there was the subject of conflicting testimony at trial.
Barger testified in detail about that night's sequence of events. According to Barger, appellant called her and said that he wanted to visit her at her apartment. Barger told him that she did not want him to come over. Barger testified that she was scared of appellant and drove to a local bar to try to find her husband (from whom she was separated) to seek his advice. Appellant ended up at the same bar and although Barger talked to him, the two left separately. Later that night Barger heard a knock at the door and, mistakenly believing that the visitor was her landlord, Barger opened the door to appellant who forced his way into her apartment. According to Barger, appellant then continued to try to persuade her to drop the charge against him and became angry when she said that she was not going to change her statement to the police. Barger testified that appellant, who had been drinking heavily throughout the night, shoved her down on her bed and said that they were going to talk about this further.
Barger testified that appellant began shoving her around the apartment, saying that he was going to hurt her if she did not try to drop the charge. Appellant repeatedly shoved her onto the bed and picked her back up. Appellant wrapped his hands around her neck and continued to shake her, so that the back of her head hit a heater attached to the wall behind her bed. When Barger told appellant that she had to use the bathroom, appellant dragged her to the bathroom and slammed her down on the toilet. Then he back handed her. Appellant brought Barger back to the bed and choked her so hard that she temporarily blacked out. Appellant told her that he had hidden a syringe in her car that was full of drugs and that he would shoot her with a lethal overdose. Barger testified that appellant trapped Barger on her bed by straddling her chest so that she could not get up. She tried to scream for help but when ever she did, appellant tightened the grip on her throat and told her that if she made a sound, he would kill her. According to Barger, appellant never slept that night and continued to hold her down.
One of Barger's neighbors testified that he heard "some thumping noises" that night at about 1:00 or 2:00 a.m. coming from Barger's apartment. The neighbor stated that he heard a man's voice say, "I'll kill you," although the neighbor could not tell from the tone if the speaker was serious.
Appellant's testimony about what happened that night was very different. According to appellant, Barger invited him over to her place and the two decided to go out to the bar together. Appellant claimed that Barger was drunk and that when they returned together to her apartment, she began attacking him because she was upset about a woman appellant had spoken to at the bar. Appellant contended that Barger jumped on him and clawed him and that he only fought back to protect himself. Appellant stated that they struggled for a few minutes but then they made up. Later, Barger fell into the wall in the bathroom and hurt her head. Appellant stated that Barger was physically fine at the end of the night, however.
Both appellant and Barger testified that appellant left the apartment around 8:30 in the morning. Barger then called her daughter, Amy Hale. Barger testified that she was scared and hurt and called Amy to see if she would take her to the hospital. Amy stated that she received a call from her mother around 9:00 a.m. During this call, Barger said that appellant had beaten her. Amy called 911 and left for Barger's apartment.
Sheriff's Deputies Renner and Miller responded to the emergency call and arrived at Barger's shortly thereafter. Barger was treated by a medical squad and taken to the hospital. Her throat was swollen and she complained that she could hardly breathe. Barger had a big cut on her face and a bruised nose. She also experienced pain around her collar bone.
The deputies found appellant at his mother's home later that morning. They told appellant that he was being placed under arrest for an incident that had happened at Barger's apartment. Appellant was not advised of his Miranda rights at that time.
Appellant asked how he could be arrested without any evidence of harm to Barger and then stated that he wanted to file charges against her. The deputies told appellant that his request could be addressed at a later time. Appellant was led to Deputy Renner's cruiser, and Deputy Miller drove alone in his cruiser. Deputy Renner testified that he had intended to take a formal statement from appellant after arriving at the sheriff's office and advising appellant of his rights.
During the ride in the cruiser, appellant told Deputy Renner that Barger had invited him to go out the night before and that they had stopped by a truck stop and a bar. Appellant continued to say that he and Barger had returned to her apartment, eaten, and engaged in sexual intercourse. Appellant stated that when he had left her that morning she was fine. Deputy Renner testified that he did not initiate this conversation. However, the deputy asked appellant which truck stop and which bar appellant and Barger had visited, telling appellant that he needed to know the answers to these questions so that he could follow up on appellant's complaint.
Appellant was charged with three crimes: aggravated burglary, retaliation, and abduction. On the day of trial, appellant filed a motion to suppress. The trial court held a hearing and denied appellant's motion. At the conclusion of the trial, the jury found appellant guilty of retaliation and abduction. Appellant was sentenced to three years on each offense to be served consecutively. Appellant raises four assignments of error for our review.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS HIS STATEMENT TO THE POLICE AFTER BEING PLACED INTO CUSTODY.
Under his first assignment of error, appellant argues that statements made to Deputy Renner following his arrest should have been suppressed by the trial court because appellant was not given Miranda warnings.
When considering a motion to suppress, the trial court is the primary judge of the credibility of witnesses and the weight of the evidence. State v. Fanning (1982), 1 Ohio St.3d 19, 20. If the trial court's findings are supported by competent and credible evidence, then the appellate court must accept them. State v.Williams (1993), 86 Ohio App.3d 37, 41. Relying on the trial court's factual findings, the reviewing appellate court determines "without deference to the trial court, whether the court has applied the appropriate legal standard." State v. Anderson
(1995), 100 Ohio App.3d 688, 691.
Appellant argues that his Miranda rights were violated and that statements made to Deputy Renner should have accordingly been suppressed by the trial court. On the subject of Miranda rights, the United States Supreme Court has stated the following:
 The special procedural safeguards outlined in Miranda are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.
Rhode Island v. Innis (1980), 446 U.S. 291, 300, 100 S.Ct. 1682,1689. See, also, State v. Phillips (1991), 75 Ohio App.3d 785,788. "Custodial interrogation" is defined as "questioninginitiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." (Emphasis added.) Berkemer v. McCarty
(1984), 468 U.S. 420, 428, 104 S.Ct. 3138, 3144, quoting Mirandav. Arizona (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 1612. A volunteered statement is admissible regardless of the speaker's custodial status. State v. Henderson (Feb. 21, 1986), Montgomery App. No. 9229, unreported, citing State v. Maurer (1984), 15 Ohio St.3d 239,256; Innis, 446 U.S. at 301.
This court has previously determined that a defendant's voluntary, unprovoked statements to police while riding in a cruiser en route to jail do not fall within the protections of Miranda, even though the defendant had been placed under arrest. See State v.Williams (June 1, 1993), Butler App. No. CA92-07-133, unreported. In the case sub judice, appellant's statements to the police were not provoked by a custodial interrogation but were offered by appellant as support for bringing charges against Barger. The conversation was initiated by appellant and consisted mainly of comments in his defense. Although the deputy asked appellant which truck stop and which bar he had visited, these questions were strictly clarifications of appellant's statement and were purportedly asked so that the deputy could follow up on appellant's complaint. Because appellant's statements were voluntary and unprovoked, they need not be suppressed. Accordingly, the first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN ALLOWING HEARSAY TESTIMONY BY THE VICTIM'S DAUGHTER, REGARDING THE FACTS AND CIRCUMSTANCES OF THE VICTIM'S INJURIES.
Under his second assignment of error, appellant claims that the trial court should not have allowed Barger's daughter to testify that her mother told her that appellant had beaten her. Appellant argues that this testimony was inadmissible hearsay and did not fall under the excited utterance exception because Barger was not under the stress or excitement caused by a startling event or condition at the time that she made these statements.
The admission or exclusion of relevant evidence rests within the discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. Absent an abuse of discretion as well as a showing that the accused has suffered material prejudice, an appellate court will not disturb the ruling of the trial court as to the admissibility of evidence. State v.Martin (1985), 19 Ohio St.3d 122, 129, certiori denied (1986),474 U.S. 1073, 106 S.Ct. 837.
Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Although hearsay testimony is not generally admissible, Evid.R. 803 establishes several exceptions to the hearsay rule. One such exception is an excited utterance, which is "a statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). An excited utterance is the product of reactive rather than reflective thinking. State v.Taylor (1993), 66 Ohio St.3d 295, 300. The rationale for this hearsay exception has been explained as follows:
 Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense. Accordingly, Rule 803(2) assumes that excited utterances are not flawed by lapses of memory or risks of insincerity.
Id., quoting 1 Weissenberger's Ohio Evidence (1992), Section 803.16.
Therefore, in order for a statement to be admitted as an excited utterance, it must be shown that the declarant was under the excitement of a startling event so that the statement was not a product of reflective thought. Taylor, 66 Ohio St.3d at 300. The Supreme Court of Ohio has determined the following:
 The passage of time between the statement and the event is relevant but not dispositive of the question. "[E]ach case must be decided on its own circumstances, since it is patently futile to attempt to formulate an inelastic rule delimiting the time limits within which an oral utterance must be made in order that it be termed a spontaneous exclamation."
Taylor at 303, quoting State v. Duncan (1978), 53 Ohio St.2d 215,219-220.
Barger's daughter Amy testified about the phone call she received from her mother at about 9:00 in the morning. Amy testified to the following:
 Q. And what was her [Barger's] condition when she called you?
 A. She was in hysterics. I could barely understand her.
 Q. What did you say to her?
 A. I just said, "What's wrong? Tell me what's wrong."
 Q. And what did she tell you?
 A. She, at first the only things that came out of her mouth was `He beat me', and she kept repeating it over and over.
 Q. What did you say?
 A. And I said, `Who? Danny?' And she said, `Yes.' And I asked her what happened, and she told me kind of quick that he had beat her all night in her apartment and that she couldn't get away from him.
Appellant argues that Barger was not in an excited state when she uttered the statements above, saying that her statement was made after appellant's injuries had been inflicted and after she had time to compose herself. In support of his claim, appellant points out that when the medical squad arrived, it was determined that Barger's heart rate and blood pressure fell within the normal range. However, there was evidence that Barger's resting heart rate and blood pressure were low, so that what may be normal for others may have been high for Barger's body. Moreover, such medical indicators were taken some time after Barger's frantic phone conversation with her daughter during which the statements in question were made.
At trial, Barger testified that appellant beat her and physically held her down all night long. Barger called Amy shortly after appellant left her apartment. Barger sounded so upset on the phone that her daughter called 911. The deputies who responded to the emergency call testified that Barger was physically shaking and crying. The deputies saw that Barger had suffered physical injuries and that her apartment was in a state of disarray. Amy, who arrived shortly thereafter, said that her mother was crying and was saying that she could not breathe. Amy said that Barger was "on the verge of hyper-ventilating," and that her face was swollen. Amy arrived within twenty minutes of her mother's phone call, and at that time, Barger was still extremely upset.
Keeping in mind that there is no set amount of time after which the excited utterance exception cannot be applied, we cannot say the that the trial court abused its discretion by admitting this testimony into the evidence. There is competent, credible evidence that shows that Barger was in an extremely agitated emotional state when she uttered the incriminating statement to her daughter so that her reflective faculties were dominated by the stress of the startling events of the night before. Finding no abuse of discretion, we need not address the question of whether appellant was materially prejudiced by the trial court's action. Therefore, the second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN ALLOWING THE LAY WITNESS, DEPUTY RENNER TO GIVE EXPERT MEDICAL OPINION EVIDENCE.
Under this assignment of error, appellant argues that it was error for the trial court to allow Deputy Renner to testify to his belief that the marks he observed on Barger's neck were indicative of choking. Appellant claims that the deputy sheriff had no scientific, technical, or other specialized knowledge that would assist the jury in understanding the evidence or determining a fact in dispute and should have been precluded from giving his opinion on the probable cause of Barger's injuries. In reviewing this assignment of error, we must uphold the ruling of the trial court unless such judgment constituted an abuse of discretion and materially prejudiced the accused. Martin,19 Ohio St.3d at 129.
Appellant asserts that the trial court judge improperly allowed Deputy Renner's testimony as "expert medical opinion." However, it appears that the court admitted the deputy's testimony as lay opinion testimony, which was deemed trustworthy, in part, on the basis of the deputy's numerous years of experience in law enforcement. The relevant portion of the trial transcript states the following:
 Q. Now were the marks that you observed on her [Barger's] neck consistent with marks that could be left on a person's neck when they are being choked by someone?
 MR. BURNS: Objection. Foundation. Qualifications.
THE COURT: Any response?
 MS. FERGUSON: Your Honor, this officer has already testified he has worked as a deputy for 17 1/2 years. He has had plenty of experience dealing with people's injuries and marks.
 THE COURT: I think that is sufficient foundation for this question. It is overruled. You may answer.
 A. I believe so, yes.
Evid.R. 701, which establishes the standard for admissibility of opinion testimony by lay witnesses, states as follows:
 If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue.
In this case, Deputy Renner's opinion was based upon his personal observations of Barger's injuries and his seventeen and one-half years as a sheriff's deputy, during which he had presumably seen similar injuries. His opinion was helpful to a clear under standing of his testimony and to a determination of a fact in issue. See State v. Stout (1987), 42 Ohio App.3d 38; State v.Fricke (June 14, 1993), Warren App. No. CA92-09-080, unreported. Therefore, we find that the trial court did not abuse its discretion in admitting Deputy Renner's testimony. Following our stan dard of review, we are not required to determine whether appellant was materially prejudiced by the trial court's action, since there has been no abuse of discretion. Accordingly, we overrule appellant's third assignment of error.
Assignment of Error No. 4:
 THE VERDICT OF THE JURY BELOW WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant claims that the jury verdict was against the manifest weight of the evidence. Appellant contends that the jury failed to give appellant's explanation of events due consideration.
To determine whether a verdict is against the manifest weight of the evidence, we must do the following:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Statev. Martin (1983), 20 Ohio App.3d 172, 175. When reviewing a claim that a verdict is against the manifest weight of the evidence, an appellate court must keep in mind that the jury was in the best position to judge the credibility of the witnesses and the weight to be given to the evidence. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The court of appeals must unanimously disagree with the jury's resolution of conflicting testimony in order to reverse a conviction based on a finding that the verdict is against the weight of the evidence.State v. Thompkins (1997), 78 Ohio St.3d 380, 389.
R.C. 2905.02, which defines the offense of abduction, states the following:
 (A) No person, without privilege to do so, shall knowingly do any of the following:
 (1) By force or threat, remove another from the place where the other person is found;
 (2) By force or threat, restrain the liberty of another person, under circumstances which create a risk of physical harm to the victim, or place the other person in fear;
 (3) Hold another in a condition of involuntary servitude.
The part of R.C. 2921.05 that is relevant to our review defines the crime of retaliation as follows:
 (B) No person, purposely and by force or by unlawful threat of harm to any person or property, shall retaliate against the victim of a crime because the victim filed or prosecuted criminal charges.
Reviewing the record, we cannot say that the jury clearly lost its way and created a miscarriage of justice so that appellant's convictions should be overturned. Rather, we find that the record contains sufficient evidence to support appellant's convictions for both offenses. There was testimony that appellant beat Barger throughout the night and threatened to kill her. There was evidence that appellant trapped Barger in her own apartment, preventing her from leaving her bed by sitting on top of her. Such evidence supports the jury verdict as to the offense of abduction. Moreover, there was testimony that appellant threatened Barger and caused her physical injury because she would not drop the charge she had filed against him. Such evidence justifies the jury's guilty verdict for the retaliation charge. The jury was not obligated to accept appellant's versions of the events that occurred. Finding that these convictions are not against the manifest weight of the evidence, we overrule appellant's final assignment of error.
Judgment affirmed.
POWELL, P.J., and VALEN, J., concur.